# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON

Assigned on Briefs August 2, 2016

## STATE OF TENNESSEE v. JAKEIL MALIK WALLER

**Appeal from the Circuit Court for Madison County**
**No. 15-41     Donald H. Allen, Judge**

_____

**No. W2015-02361-CCA-R3-CD – Filed December 15, 2016**

_____

In December 2014, the Madison County Grand Jury indicted Jakeil Malik Waller ("the Defendant") and the Defendant's brother, Jernigal Blackwell, for second degree murder and aggravated assault. Following a trial, a jury convicted the Defendant of second degree murder and felony reckless endangerment, as a lesser included offense of aggravated assault, and the trial court sentenced the Defendant to an effective sentence of twenty-seven years' incarceration. On appeal, the Defendant contends that: (1) the evidence was insufficient to support his conviction for second degree murder; (2) the prosecutor committed misconduct during closing argument; and (3) the trial court abused its discretion by admitting two photographs of the victim that were not relevant to any issue at trial. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

George Morton Googe, District Public Defender, and Gregory D. Gookin, Assistant District Public Defender, for the appellant, Jakeil Malik Waller.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Jerry Woodall, District Attorney General; and Aaron J. Chaplin, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

This case arises out of a fight between two young men, which ended when the Defendant and his brother fired multiple shots into a crowd of people who were watching the fight—killing Shomari Peterson and injuring Thomas Reid, Jr. At trial, Jessica Spencer testified that she was living at Parkway East Apartments in Jackson on July 27, 2014. On that day, Ms. Spencer saw a crowd gathering in a grassy area behind one of the apartment buildings, and she heard someone say, "[T]hey [sic] fixing to fight[.]" Ms. Spencer went to where the crowd had gathered and began recording the scene with her cell phone. She explained that a fight broke out between Tristan Cook and another young man. According to Ms. Spencer, the other man "was whupping Tristan," and several people stepped in to help Tristan[1] and break up the fight. Then, Ms. Spencer's boyfriend, Quantavious Anderson, started to fight with the man who had beaten up Tristan. At that time, Ms. Spencer saw the Defendant come from behind one of the nearby buildings to stand at the edge of the crowd. Ms. Spencer recalled that the Defendant was wearing gray and black clothing and a hat. She noticed that the Defendant was "fidget[ing]" with something and then pulled out a black handgun and shot into the crowd of people. Ms. Spencer stated that she saw the Defendant shoot the gun one time, but she heard additional gunshots as she ran from the scene. She said that she saw someone with a bat but did not see anyone else with a gun.

Ms. Spencer testified that, several days after the shooting, she dropped her cell phone and cracked the screen. She then sold her phone at a machine at a mall. Ms. Spencer testified that, before her phone was damaged, she showed the cell phone video of the incident to the mother of one of the shooting victims. She explained that she did not initially turn it over to police because she did not want to get involved. However, an investigator with the Jackson Police Department ("JPD") subsequently asked her about the cell phone video and the location of her phone.[2] Ms. Spencer identified the Defendant in the video. She then reviewed several screenshots from the cell phone video. She identified the Defendant in one of the screenshots and stated that it showed the Defendant holding up a gun and "getting ready to shoot[.]"

Jamarion Snipes testified that, on the day of the shooting, he and his best friend, Shomari Peterson, were at a restaurant when Mr. Peterson received a phone call. Mr.

---

[1] Because several witnesses share the same surname, we will refer to some individuals by their first names in order to distinguish between witnesses. We intend no disrespect.

[2] Apparently, the investigator recovered Ms. Spencer's cell phone following this conversation; however, it is unclear from the record how this was accomplished.

- 2 -

Peterson said that they needed to go back to Parkway East because some people were "fixing to jump on Tristan[.]" Jamarion explained that Tristan had intervened in a fight between his girlfriend and another woman a few days earlier and the other woman's boyfriend, Martel Majors,[3] wanted to fight Tristan. Jamarion said that he and Mr. Peterson returned to the apartment complex around 5:00 p.m. As they were walking through the parking lot, Jamarion noticed four men sitting on the hood of a car. He knew two of the men—the Defendant and the Defendant's brother, Jernigal Blackwell. He recalled that the Defendant had on a backwards ball cap and gray sweat pants and that Mr. Blackwell had on orange shorts. Jamarion testified that, as he and Mr. Peterson approached Tristan, he heard someone say that they needed to wait until Tristan's uncle arrived. While they waited for Tristan's uncle, about thirty to forty people gathered outside. Eventually, Tristan and Mr. Majors began arguing and then started to fight.

Jamarion recalled that, at the beginning of the fight, the Defendant announced, "I'm going to sit back in the breezeway and make sure nobody just jump[s] in. You ain't go[t] to worry about nothing." At that time, he noticed Mr. Blackwell reaching in his pockets. Mr. Peterson pointed a baseball bat at Mr. Blackwell and said, "Keep your hands out [of] your pocket. You don't need to do that." Jamarion stated that, when another man jumped into the fight, he heard gunshots. When the shooting began, Jamarion and Mr. Peterson "tried to take off running," but Mr. Peterson was hit with a bullet and fell down. Two men picked up Mr. Peterson and carried him into a nearby apartment. Jamarion testified that he looked back when Mr. Peterson fell and saw the Defendant and Mr. Blackwell shooting at them. He estimated that Mr. Peterson was five or six feet away from the Defendant and Mr. Blackwell when they began shooting. He stated that he heard about twenty gunshots in total. After the shooting, Jamarion learned that Mr. Peterson had been shot. He stated that he went to the apartment where Mr. Peterson was located and that Mr. Peterson was "in the house bleeding to death and then my cousin took off his shirt and wiped his face." Mr. Peterson said, "Please don't let me die. Please don't let me die[.]"

Jamarion recalled that, when the police arrived on the scene, the Defendant and Mr. Blackwell avoided the officers and left the apartment complex. Jamarion testified that Mr. Blackwell fired the first shot but that he also saw the Defendant shooting from the side of the building. He stated that he knew Mr. Blackwell had a gun before the shooting because it had an extended clip that was "hanging out of his shorts[.]"

On cross-examination, Jamarion said that Tristan initially did not want to fight and that someone called Tristan's uncle over "just to make him fight[.]" Jamarion recalled

---

[3] At trial, Jamarion did not know the name of the man who fought Tristan. However, we glean from the record that the man's name is Martel Majors.

that Tristan's uncle arrived with four other people before the fight. Jamarion said that Mr. Blackwell fired the first shot and that he believed the first shot hit Mr. Peterson. He stated that Mr. Peterson fell down before the Defendant fired a shot. He said that Mr. Peterson was attempting to run away when he was shot. He stated that, after the Defendant started shooting, "They was [sic] all shooting back at each other."

Averyion Cook testified that he was at Parkway East with his brother, Tristan, when a group of people began gathering in a parking lot. He recalled that the Defendant and Mr. Blackwell were standing with the group of people with "their hands in their pocket[s] the whole time." Averyion explained that the crowd was there to watch Tristan fight Mr. Majors because the day prior the mother of Tristan's child got into a fight with Mr. Major's girlfriend and Tristan stepped in.

Averyion recalled that the crowd began to get "rowdy" after the fight was over. At that time, he noticed the Defendant and Mr. Blackwell backing away from the crowd. As Mr. Majors ran behind the apartment building, Averyion heard gunshots. Averyion stated that the Defendant shot up into the air one time and, at first, no one moved. Then Mr. Blackwell started shooting, and "everybody started running." As he fled, Averyion saw the Defendant and Mr. Blackwell shooting towards the crowd. Although he did not see Mr. Peterson get shot, Averyion saw Mr. Peterson lying on the ground holding his chest. Averyion identified the Defendant in the cell phone video of the fight and described the Defendant's clothing as a dark gray shirt and gray jogging pants. He also identified Mr. Blackwell, who was wearing orange shorts in the video.

On cross-examination, Averyion testified that he did not see his and Tristan's uncle at the fight. Averyion further testified that he did not see anyone with a baseball bat at the scene. He agreed, however, that the cell phone video showed a man in the crowd holding a bat. Averyion recalled hearing "[a] bunch" of shots, and he stated that he only saw the Defendant and Mr. Blackwell firing a weapon.

Jacobe Snipes testified that he was at Parkway East at the time of the shooting. Jacobe explained that he saw the Defendant and Mr. Blackwell sitting on the hood of a car before the fight. During the fight, Jacobe noticed that "[t]he dude in the orange [shorts] kept like touching his pocket[.]" He realized that the man had a gun in his pocket. He stated that, when the fight stopped, the Defendant and Mr. Blackwell started shooting towards the crowd. Jacobe said that Mr. Blackwell fired first and that both men were standing between two apartment buildings. As he ran from the area, Jacobe heard several more gunshots. Jacobe testified that he only saw the Defendant and Mr. Blackwell firing a gun and that he did not see anyone else with a gun that day. Jacobe recalled that he helped Mr. Peterson to a nearby apartment after Mr. Peterson was shot. Once inside, Mr. Peterson fell to the floor in the kitchen and began to cough up blood.

- 4 -

On cross-examination, Jacobe explained that he was at the gates of the apartment complex when he heard there was going to be a fight. He saw a crowd of people and went over to the group right before the fight began. Jacobe could tell that the Defendant and Mr. Blackwell had guns because their "pocket[s] [were] like shaped in a gun[.]" Jacobe said that he did not see anyone with a baseball bat. He stated that he first saw Mr. Blackwell shoot towards the crowd of people, and he saw Mr. Peterson get shot in the chest. Jacobe said that Mr. Peterson was shot immediately when the shooting started, and he saw both the Defendant and Mr. Blackwell shooting at the crowd where Mr. Peterson was standing. Jacobe estimated that he heard more than ten gunshots.

Thomas Reid, Jr. testified that, on the day of the shooting, he pulled into the parking lot at Parkway East and saw a "big crowd of people" watching Tristan and Mr. Majors. Mr. Reid attempted to break up the fight by pulling Mr. Majors off of Tristan. When Mr. Anderson began fighting with Mr. Majors, Mr. Reid heard a gunshot which he thought was meant to "scatter the crowd." Mr. Reid stated that the man who fired the first shot was wearing "dark-colored clothing." Then, he heard additional gunshots, and he ran from the area. As he was running, Mr. Reid realized that he had been shot and saw blood "gushing out" from his chest. He stated that he looked back and saw the Defendant and Mr. Blackwell, who were standing in between two of the apartment buildings, shooting at him. Mr. Reid ran across the street, lay down in the grass, and told people around him that he had been shot. He stated that he did not see anyone other than the Defendant and Mr. Blackwell shooting a gun that day.

JPD Officer Kevin Livingston testified that, on July 27, 2014, he responded to a report of "multiple shots being fired and possible multiple victims" at Parkway East. When he got to the scene, he found Mr. Reid lying on the ground between two apartment buildings. Officer Livingston attempted to calm Mr. Reid and to assess Mr. Reid's injuries. He testified that Mr. Reid was shot in the upper body, and he rendered aid until an ambulance arrived. Officer Livingston stated that he was one of the first officers on the scene and that there were a large number of people around, and he described the scene as "pretty chaotic[.]"

Sergeant Donald Lowe of the JPD testified that he also responded to Parkway East. When he arrived, he saw "several people out there . . . running around screaming[,]" and he saw Mr. Reid lying in the grass. As he retrieved his medical bag from his patrol car, Sergeant Lowe was informed that Mr. Peterson had been shot and that he was inside a nearby apartment. Sergeant Lowe located Mr. Peterson inside that apartment. Mr. Peterson was lying in the kitchen floor in a large pool of blood. Mr. Peterson had no pulse and was unresponsive. Sergeant Lowe explained, "I tried to do whatever I could for him, but it didn't appear that he was still alive[.]" He secured the apartment and stayed with Mr. Peterson until EMS arrived.

Paul Spencer, a supervisor with Medical Center EMS, testified that he responded to the scene of the shooting and was directed inside an apartment by police officers. There, he found Mr. Peterson lying face-down on the floor of the kitchen. He noticed that a large amount of blood had already coagulated on the floor and on Mr. Peterson. Mr. Spencer rolled Mr. Peterson onto his back and determined that he was not breathing and had no pulse. Mr. Spencer saw what appeared to be a small wound to the center of Mr. Peterson's chest.

JPD Investigator Marvin Rodish, Jr., testified that he was called to process the scene at Parkway East. He met with patrol officers and assessed the scene for potential evidence. Investigator Rodish also took several photographs of Mr. Peterson inside the apartment. He testified that one photograph showed Mr. Peterson lying face-up in the kitchen and depicted the upper torso down to the knee area. A second, "close-up" photograph showed Mr. Peterson's face and head. From the photographs, Investigator Rodish identified a "circular hole" in Mr. Peterson's upper torso.

At that time, the State sought to introduce the photographs into evidence. The Defendant objected and argued: "[W]e agree the man died from a gunshot wound. I just think it's overly gory and bloody, and . . . it doesn't really depict anything other than that he was extremely bloody, which numerous witnesses have testified to. I just think it's— the probative value is outweighed by the prejudicial effect."

The State responded that the photographs "depict[ed] the actual wound" in Mr. Petersons' chest. The trial court overruled the Defendant's objection finding that the photographs of the deceased victim showed "where he was found, the position there[.]" The trial court acknowledged that the photographs contained a large pool of blood, the court stated that it did not find anything "overly gruesome" about the photos.

Investigator Rodish further testified that he collected two projectiles, one flattened-out piece of metal, two baseball bats, and some .45 caliber shell casings from the crime scene. He stated that he found the shell casings near the sidewalk that ran between two buildings. He found the projectiles in the parking lot. Investigator Rodish stated that he did not find any .380 shell casings and that no firearms were recovered from the scene.

Investigator Isaiah Thompson testified that he was the lead investigator in the case for the JPD. He initially went to the crime scene where he interviewed multiple witnesses. Investigator Thompson eventually developed the Defendant and Mr. Blackwell as suspects, leading to their arrests. Once the Defendant was in custody, Investigator Thompson interviewed him. The Defendant signed a waiver of his Miranda rights and provided the investigator with a handwritten, signed statement. In his

statement, the Defendant admitted to being at Parkway East at the time of the shooting, but he denied being at the scene of the fight. The Defendant initially told Investigator Thompson that he left the apartment complex before police arrived with his girlfriend in her Ford Focus. However, when Investigator Thompson showed the Defendant a police photograph of the scene showing his girlfriend's Ford Focus at the scene with police tape around it, the Defendant changed his story and said that he left with "someone else." Investigator Thompson testified that he identified the Defendant from the cell phone video and stated that, on the video, the Defendant had on a gray shirt, dark-colored pants, and a gray and yellow hat "turned backwards." He also identified Mr. Blackwell in the cell phone video and stated that Mr. Blackwell had on orange shorts. Investigator Thompson stated that there were no firearms recovered from the crime scene. Additionally, Investigator Thompson found no evidence, such as casings or projectiles, to indicate that shots had been fired towards the Defendant. He explained that the only projectiles found at the scene were in the opposite direction from where the Defendant and Mr. Blackwell had been standing.

Fred Lytton testified that, in October 2014, he was an inmate at the local jail and shared a cell with the Defendant. Mr. Lytton and the Defendant discussed the Defendant's case, and Mr. Lytton learned that the Defendant was in jail for murder. The Defendant told Mr. Lytton that he was involved in a "shootout with some gang members" at an apartment complex. The Defendant was at the apartment complex for a birthday party when he noticed a guy who previously had a confrontation with his cousin "and [had] helped beat her up." He said that his cousin's boyfriend pulled up and wanted to fight the guy, but the guy "had to call his gang chief[.]"

The Defendant told Mr. Lytton that he had purchased a .380 caliber gun from Mr. Blackwell and that he had the gun at the birthday party. The Defendant said that Mr. Blackwell brought a .45 caliber weapon with an extended clip to the party. The Defendant said that, during the fight, he and Mr. Blackwell retrieved their guns from inside the apartment. The Defendant then saw a gang member at the fight go to a car and "g[e]t something." According to the Defendant, someone in the crowd said to Mr. Blackwell, "I don't know what you're doing with your hand or anything," and Mr. Blackwell pulled out his .45 gun and started shooting at the crowd. The Defendant admitted that he fired first and that his "first shot was in the air" and "[t]owards the crowd." When he heard Mr. Blackwell's gun go off, the Defendant said he "fell back behind a wall . . . to try to get cover till he unloaded his whole clip." On cross-examination, Mr. Lytton stated that the Defendant told him that, when he fell back behind the wall, a large group of gang members started shooting at him.

Dr. Adele Lewis testified that she was a forensic pathologist and the interim Chief Medical Examiner for the State of Tennessee. Dr. Lewis stated that she performed the

autopsy on Mr. Peterson. She first took an x-ray of the body, which showed a bullet lodged in the right side of Mr. Peterson's back. During the autopsy, Dr. Lewis discovered that the bullet entered Mr. Peterson at the base of the neck, went through his breastbone, and then struck the major blood vessels to the heart. The bullet then lodged underneath the skin of the right side of the back. Dr. Lewis stated that the cause of death was a gunshot wound to the torso. She stated that she retrieved the bullet from Mr. Peterson's body, and it was sent for testing.

Special Agent Kasia Michaud testified that she worked as a forensic scientist in the Firearms Identification Unit of the Tennessee Bureau of Investigation. Agent Michaud explained that she received three bullets and five cartridge cases to test in connection with the Defendant's case. She examined the cartridge cases and determined that all five cartridge cases were fired from the same firearm. She then examined the bullets and found that two of the bullets were .45 caliber bullets based upon their size and weight. Agent Michaud determined that the final bullet, which had been retrieved from Mr. Peterson's body by the medical examiner was "consistent with a .380 auto caliber bullet" based upon its size and weight.

Following deliberations, the jury found the Defendant guilty of second degree murder and reckless endangerment. The trial court sentenced the Defendant to consecutive sentences of twenty-five years for second degree murder and two years for reckless endangerment, for an effective sentence of twenty-seven years' incarceration. The Defendant filed a timely motion for new trial, which the trial court denied following a hearing. This timely appeal follows.

## II. Analysis

*Sufficiency of the Evidence for Second Degree Murder*

The Defendant contends that the evidence is insufficient to support his conviction for second degree murder. Specifically, he argues that the testimony of the State's witnesses was contradictory and failed to establish who fired the shot that killed the victim. The State responds that "ample evidence" was presented to support the Defendant's conviction. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact-finder. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This

court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As applicable to this case, second degree murder is defined as "[a] knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1) (2010). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b) (2010).

In viewing the evidence in the light most favorable to the State, we conclude that the Defendant's conviction for second degree murder is supported by sufficient evidence. The evidence at trial established that the Defendant and Mr. Blackwell fired into a crowd of people multiple times, striking and killing the victim, who was in the crowd. The Defendant later admitted his involvement in the shooting to Mr. Lytton and told Mr. Lytton that he had used a .380 caliber gun. The State's expert witnesses testified that the bullet that killed the victim was consistent with a .380 caliber gun. Moreover, the only other person firing a gun was Mr. Blackwell, and the proof established that Mr. Blackwell used a .45 caliber gun, which was inconsistent with the bullet that killed the victim. While there were minor discrepancies in the testimony of the State's witnesses, the credibility of witnesses, the weight of their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as the trier of fact, and this court will not reweigh the evidence on appeal. Bland, 958 S.W.2d at 659. The Defendant is not entitled to relief.

*Prosecutorial Misconduct*

The Defendant next contends that the prosecutor intentionally misstated evidence during closing argument, which constituted prosecutorial misconduct and deprived him of a fair trial. The State responds that the Defendant was not denied his right to a fair trial due to the prosecutor's closing argument. We agree with the State.

- 9 -

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to "engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence." State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991).

In State v. Goltz, 111 S.W.3d 1 (Tenn. Crim. App. 2003), this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

Goltz, 111 S.W.3d at 6.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. Id. at 344.

The Defendant argues that the State engaged in prosecutorial misconduct based upon the prosecutor's following statements during closing argument:

The 380 that he told his brother, hey, I got my 380? The brother bringing the 45. It's important. You remember Mr. Lytton told you about the 380.

At that time, as you recall, you also heard from the TBI lab person. They talked about a 380, and she found the 380 that came from—the bullet from the Medical Examiner's Office that went to [the] TBI was a 380.

Following the prosecutor's comment, the Defendant objected, and the trial court issued the following instruction to the jury, "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements are made that you believe are not supported by the evidence, you should disregard them." Thereafter, the prosecutor immediately corrected the statement, arguing that the bullet from the victim was "[r]evealed to be consistent with . . . a 380 auto caliber bullet."

From the record, it is unclear whether the prosecutor's comment that the bullet from the medical examiner "was a 380" was an intentional misstatement of the evidence. Agent Michaud testified that, while there were a few calibers that used similar measurements, the bullet that was retrieved from the victim's body was "most consistent with a 380 auto caliber bullet." However, even if the prosecutor's statement was improper, we do not believe that any impropriety affected the jury's verdict. As acknowledged by the Defendant, the trial court quickly issued a curative instruction, charging the jury that the prosecutor's statement was not evidence and should be disregarded if the jury found it was not supported by the evidence. The jury is presumed to have followed this instruction. State v. Banks, 271 S.W.3d 90, 137 (Tenn. 2008). Moreover, following the Defendant's objection, the prosecutor immediately corrected his statement to more closely conform to Agent Michaud's testimony. Although the Defendant asserts that the prosecutor made the statement intending to "make the jurors believe that a .380 caliber bullet was retrieved from the victim" and to link this evidence with testimony that the Defendant said he used a .380 caliber gun, the prosecutor was certainly permitted to argue the State's theory of the case to the jury and make reasonable inferences based on the evidence admitted at trial. Finally, there was no "cumulative effect" of the prosecutor's statement and other errors in the record, and the case against the Defendant was strong. Thus, the prosecutor's statements during closing argument do not constitute reversible error, and the Defendant is not entitled to relief on this ground.

*Admission of Photographs of the Victim*

Lastly, the Defendant contends that the trial court erred by admitting the two photographs of the victim's body taken by Investigator Rodish inside the apartment. He

argues that the photographs were "gory" and unnecessary because he did not contest the cause of the victim's death or the positioning of the victim's body and because Dr. Lewis could have testified to any information contained in the photographs. The State responds that the trial court did not abuse its discretion in admitting the photographs of the victim. We agree with the State.

In order to be admitted into evidence, a photograph must be relevant to an issue that the jury must decide. State v. Thomas, 158 S.W.3d 361, 394 (Tenn. 2005). "[E]vidence is relevant if it helps the trier of fact resolve an issue of fact." State v. James, 81 S.W.3d 751, 757 (Tenn. 2002) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-8 (4th ed. 2000)). However, relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value. State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). "[T]he admissibility of photographs lies within the discretion of the trial court," whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." Id. at 949.

Rule 403 of the Tennessee Rules of Evidence provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951 (quoting Advisory Committee Note to Federal Rule of Evidence 403). This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)). Photographs must never be used "solely to inflame the jury and prejudice them against the defendant." Banks, 564 SW.2d at 951. Evidence which only appeals to the sympathies of the jury, conveys a sense of horror, or "engenders an instinct to punish" should be excluded. Collins, 986 S.W.2d at 20. Factors to be considered when determining whether the probative value of photographs of homicide victims outweighs their prejudicial effect include:

> [T]he value of the photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

Banks, 564 S.W.2d at 951. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." Id.

"As a general rule, where medical testimony adequately describes the degree or extent of an injury, gruesome and graphic photographs should not be admitted." Collins, 986 S.W.2d at 21 (citing State v. Duncan, 698 S.W.2d 63, 69 (Tenn. 1985)). Photographic evidence may be excluded when it does not add anything to the testimonial description of the injuries. Banks, 564 S.W.2d at 951. If the defendant offers to stipulate to the facts shown in the photograph or the defendant does not dispute the testimony that the photographs illustrate, the prejudicial effect is more likely to substantially outweigh the photographs' probative value. Id.

Turning to the instant case, we agree with the trial court that the photographs at issue are not "overly gruesome" or gory. Additionally, because the Defendant contested that he shot and killed the victim the probative value of the photographs is high. The photographs—taken before the victim's body was moved—clearly show the location of the gunshot wound to the base of the victim's neck. The photographs corroborate testimony from the State's witnesses about the circumstances surrounding the shooting and demonstrate that, after being shot, the victim fled into a nearby apartment where he collapsed on the floor. Moreover, it does not appear that the State introduced the photographs solely to "inflame the jury and prejudice them against the [D]efendant." Id. Accordingly, we conclude that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice to the Defendant and that the trial court acted within its discretion when it admitted the photographs into evidence. The Defendant is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE